THE STATE OF OHIO, APPELLANT, *v.* GUNNELL, APPELLEE.

[Cite as *State v. Gunnell,* 132 Ohio St.3d 442, 2012-Ohio-3236.]

*Trials—Criminal law—Double jeopardy—Mistrial—Juror misconduct— "Manifest necessity" warranting mistrial—Declaration of mistrial improper when court assumes juror has been infected with bias without inquiring of juror whether bias actually exists and whether bias could be cured—Double jeopardy bars retrial when mistrial declared without manifest necessity therefor.*

(No. 2010-1636—Submitted October 19, 2011—Decided July 19, 2012.)

APPEAL from the Court of Appeals for Clark County, No. 09-CA-0013, 2010-Ohio-4415.

_____

**O'CONNOR, C.J.**

{¶ 1} This case has been litigated on three separate occasions and, after each conviction, the Second District Court of Appeals has found reversible error. Most recently, the appellate court concluded that jeopardy had attached and that the guilty verdicts must be reversed. We are compelled to agree.

{¶ 2} For the reasons that follow, we hold that the trial judge erred during the second trial by improperly declaring a mistrial and that the Double Jeopardy Clause bars the retrial of the appellee, Toneisha Gunnell. Accordingly, the judgment of the court of appeals is affirmed to the extent it held that the Double Jeopardy Clause bars retrial.

**RELEVANT BACKGROUND**

{¶ 3} On June 7, 2005, Toneisha Gunnell, Mahogany Patterson, Alicia McAlmont, and Renada Manns drove to the Upper Valley Mall in Springfield, Ohio, to steal clothing. Chris Clarkson, a loss-prevention agent employed by

Macy's department store, watched as Gunnell, McAlmont, and Patterson grabbed clothing from the racks and ran from the store to a waiting car driven by Manns. Although Clarkson chased them, Manns accelerated rapidly as they got into the car.

{¶ 4}    John Deselem, a customer who witnessed the incident, stood in the lane of travel as the car sped toward him, waving his arms in an effort to stop the oncoming vehicle.  It struck him without slowing down. The force of the impact sent him into the windshield and threw him over the car and onto the ground.  He died at the scene from blunt-force injuries to his head. Although the impact had cracked the windshield, Manns drove out of the mall parking lot.

{¶ 5}    The Clark County Sheriff's Department located the car abandoned in a ditch a short distance from the mall, recovered the stolen clothing, and began efforts to apprehend the women.  The next day, Gunnell, Patterson, McAlmont, and Manns turned themselves in to Columbus police.

{¶ 6}    A Clark County grand jury indicted them on counts of murder, aggravated robbery, involuntary manslaughter, and theft, and, following a joint trial, a jury found each of them guilty of all charges.

{¶ 7}    After the appellees were indicted for murder, aggravated robbery, involuntary manslaughter, and theft, their initial convictions were reversed due to a *Batson* violation.  *State v. Manns*, 169 Ohio App.3d 687, 2006-Ohio-5802, 864 N.E.2d 657 (2d Dist.); *State v. McAlmont*, 2d Dist. No. 2005 CA 130, 2006-Ohio-6838; *State v. Patterson*, 2d Dist. No. 05CA0128, 2007-Ohio-29; *State v. Gunnell*, 2d Dist. No. 2005 CA 119, 2007-Ohio-2353.

{¶ 8}    On retrial, the case was submitted to the jury on October 1, 2007. During deliberations later that night, the jury asked the court to define the word "perverse" as it had been used in the jury instruction relating to the recklessness element of the aggravated-robbery charge.  The court did not respond to the jury's request.  The jury eventually retired at 12:22 in the morning of October 2, 2007.

Later that morning, when Juror No. 6 returned to court, she brought two pieces of paper, which were intercepted by the bailiff and shared with the court.

{¶ 9} The first piece of paper contained the following handwritten definition of the word perverse: "contrary to the manner or direction of the judge on a point of law <perverse verdict>."

{¶ 10} The second piece of paper was a printout, which read:

Manslaughter: Involuntary

Involuntary manslaughter usually refers to an unintentional killing that results from recklessness or criminal negligence, or from an unlawful act that is a misdemeanor or low-level felony (such as DUI). The usual distinction from voluntary manslaughter is that involuntary manslaughter (sometimes called "criminally negligent homicide") is a crime in which the victim's death is unintended.

For example, Dan comes home to find his wife in bed with Victor. Distraught, Dan heads to a local bar to drown his sorrows. After having five drinks, Dan jumps into his car and drives down the street at twice the posted speed limit, accidentally hitting and killing a pedestrian.

(Underlining sic.)

{¶ 11} In response to the juror's possession of this information, the trial judge held a hearing, which began at 10:41 on the morning of October 2, 2007. At the start of the hearing, the parties were informed of the issue that had developed with Juror No. 6 and her outside research. The parties agreed that Crim.R. 24 prevented the court from seating an alternate juror because the jury

3

had commenced deliberations.  Subsequently, Juror No. 6 was brought before the court and parties, and the following exchange took place:

THE COURT:  It's come to our attention that you brought some items in with you this morning.  One appears to be a handwritten definition of the term "perverse," and another one appears to be something that maybe you printed off of the internet that—

JUROR NO. 6:  Yes, I did.

THE COURT:  A definition or instruction on "involuntary manslaughter."  That's—these are things you brought in with you today?

JUROR NO. 6:  That *nobody saw them.*

THE COURT:  You're the only one that saw them?

JUROR NO. 6:  *I told her that I didn't know we weren't allowed.  I'm sorry.*

THE COURT:  Okay.  Did you—

JUROR NO. 6:  And *I didn't talk about it.*

THE COURT:  All right.  Apparently you were doing some research last night or this morning on the internet or—

JUROR NO.  6:  I just wanted to see—*everybody kept asking what the word "perverse" was, and I just wanted to look it up for myself to see exactly what it meant.*

THE COURT:  Sure.  Okay.  What about the—what about the manslaughter issue?  Was there something you were doing on the computer with respect to that?

JUROR NO. 6: No. *It was just something I wanted—that was for me. I wasn't going to show them that. I had the other—I had the definition. That was all that I was going to share.*

THE COURT: Was there—was there something inadequate or something wrong with the Court's instruction for "involuntary manslaughter" that you felt like you needed to supplement the instruction or what—was there something that wasn't clear about the Court's instruction on that?

JUROR NO. 6: No. I was—I was at home. I was on the computer, and I just—I did not get much sleep last night, and I just—that was mainly for myself. *I just wanted to have it clear in my own head.*

THE COURT: Okay. Okay. Counsel have any questions for this particular juror?

MR. SCHUMAKER: None from the State, Your Honor.

MR. REED: No, Your Honor. Thank you.

MR. KAVANAGH: No, Your Honor.

MS. CUSHMAN: No.

MR. GRIFFIN: No, Your Honor.

THE COURT: All right. Thank you, [Juror No. 6].

(Emphasis added.)

{¶ 12} The juror was excused and returned to the jury room, and then counsel shared their recommendations as to the proper remedy with the court.

{¶ 13} After initially suggesting a preference for a mistrial, the state asserted that Juror No. 6 "would have to be strongly instructed and be able to assure us that she would not use that and particularly that example." Counsel for all defendants agreed that a curative instruction would be an appropriate response.

After listening to these recommendations and the apparent agreement of defense counsel that inquiring of the jury and giving a rehabilitative instruction would be a reasonable remedy, the court nevertheless stated:

> So I guess my point is: We can bring her in, and we can all ask her and try to rehabilitate her; *and I'm sure she's going to say all the right things because, again, I think she's a nice person. And she's going to want to try to be accommodating and pleasing, and I know or I'm certain she doesn't want to be responsible for a mistrial.*
>
> So she's going to try to appease us and say what she needs to say; but, you know, I just—*I feel like that may be an exercise of futility. I don't know that I can be convinced that she's going to be able to put this out of her mind.*

(Emphasis added.)

{¶ 14} The court recessed for a short break at 11:08 A.M. So, within the span of a hearing that lasted less than one half of an hour, the trial judge in this case (1) informed the parties about Juror No. 6's research into critical legal terms, (2) discussed with counsel the possibility of seating an alternate juror, ultimately rejecting that solution after all parties agreed that Crim.R. 24 prevented that solution, (3) brought Juror No. 6 into the courtroom to inquire generally about what information she had found and why she had looked for it, but without asking her a single question about the prejudice or bias, if any, created by the improper information or about her ability to disregard it, (4) returned Juror No. 6 to the jury room, and (5) asked counsel for their opinions as to how to proceed, with defense counsel unanimously recommending a curative instruction.

6

**{¶ 15}** When the hearing resumed at 11:30, the state, having heard the judge, promptly moved for a mistrial. Over defense counsel's unanimous opposition and renewed argument for a curative instruction, and without examining the juror about the degree of her prejudice, if any, the trial judge declared that the juror had been *"irreparably* tainted" and that there was *"no other option* than to sustain the State's motion.*"* *(*Emphasis added.)

**{¶ 16}** A second short recess was taken at 11:41 A.M. The proceedings resumed at 11:45, and the court informed the jury that a mistrial had been declared.

**{¶ 17}** While addressing the jury, the judge stated, "It's simply that a juror was exposed to some bad information; and it's very difficult, if not impossible, to block that out." When the judge finished his explanation, some of the jurors had questions. The following exchange occurred:

> JUROR NO. 9: So why couldn't you have just told us [that the definition of involuntary manslaughter brought in by Juror No. 6 was wrong], and we could have gone on?
>
> THE COURT: Well—
>
> JUROR NO. 9: In Ohio that wasn't the way it was.
>
> THE COURT: Well, that's a good question. Well, first of all, 11 of you didn't know about it.
>
> JUROR NO. 9: True.
>
> THE COURT: So but the one person that had been exposed to information that getting drunk and going twice the speed limit equals manslaughter.
>
> JUROR NO. 9: So you couldn't just have told her then?
>
> THE COURT: Well, what do you think—I mean, what do you think that would have done?

JUROR NO. 9:  I think she would have realized that that wasn't right.  I mean, I would have said, "Oh, okay.  That's not Ohio law."

THE COURT:  Well, my question back to that juror would be, then, why are you looking at—

JUROR NO. 9:  I would question on that too, yeah.

THE COURT:  Why are you looking at something other than what the Court gave you?

{¶ 18} Following the mistrial, Gunnell, Patterson, McAlmont, and Manns moved to preclude retrial on double jeopardy grounds, asserting that there had been no manifest necessity for a mistrial.  The trial court denied that motion and scheduled the case for retrial.

{¶ 19} Appellees petitioned the federal court for writs of habeas corpus seeking to bar retrial on double jeopardy grounds.  The district court dismissed their petitions, concluding that the trial court's declaration of a mistrial "was not an unreasonable application of clearly established law as declared by the United States Supreme Court."  *Gunnell v. Rastatter*, S.D. Ohio No. 3:08-CV-064, at 13 (Sept. 17, 2008).  Only Manns appealed to the Sixth Circuit Court of Appeals, which affirmed.[1]  *Gunnell v. Rastatter*, 6th Cir. No. 08-4505 (Jan. 26, 2010).

{¶ 20} The state proceeded to retry Gunnell, McAlmont, and Patterson, and a third jury returned verdicts finding them all guilty of all charges.  They separately appealed, and the court of appeals again reversed their convictions.  In Patterson's and Gunnell's cases, the court held that the trial court should have declared a mistrial because a statement of a state's witness from a previous trial, which had not been admitted into evidence, had inadvertently been submitted to

---

1. Manns subsequently resolved her case by way of a plea agreement with the state.

the jury. *State v. Patterson*, 188 Ohio App.3d 292, 2010-Ohio-2012, 935 N.E.2d 439, ¶ 80 (2d Dist.); *State v. Gunnell*, 2d Dist. No. 09-CA-0013, 2010-Ohio-4415, ¶ 51. And in Gunnell's and McAlmont's cases, the court held that double jeopardy barred retrial because there had not been a manifest necessity for the mistrial declared at the second trial.[2] *Gunnell* at ¶ 194; *State v. McAlmont*, 2d Dist. No. 09-CA-21, 2010-Ohio-5879, ¶ 2-3.

{¶ 21} We accepted the state's discretionary appeal in Gunnell's case to review whether the Double Jeopardy Clause barred her retrial. 127 Ohio St.3d 1531, 2011-Ohio-376, 940 N.E.2d 985. We subsequently accepted the state's appeal in McAlmont's case and held it for the decision here. 128 Ohio St.3d 1444, 2011-Ohio-1618, 944 N.E.2d 694.

{¶ 22} The state maintains that the court of appeals improperly substituted its judgment for that of the trial court on the manifest-necessity question. It contends that the trial court acted reasonably in declaring a mistrial because Juror No. 6 had violated instructions not to research the law and the court doubted her ability to obey a curative instruction. It also contends that when a juror obtains extrajudicial information contrary to the state's case through misconduct, the situation is presumptively prejudicial, and the burden shifts to the defendant to establish that the juror was not prejudiced by the outside research.

{¶ 23} Gunnell responds that the appellate court required only that the trial court make a reasonable inquiry of the juror and further emphasizes that the state failed to meet its heavy burden of demonstrating manifest necessity for a mistrial. Gunnell also asserts that even when the prosecution moves for a mistrial based on juror misconduct, it still bears the burden to demonstrate manifest necessity for the mistrial to avoid the double jeopardy bar to a retrial.

---

2. After the state appealed to this court, Patterson negotiated a plea agreement, and the state dismissed that appeal.

**{¶ 24}** Thus, the key issue in this case is whether the trial court acted unreasonably in addressing juror misconduct and in determining that a manifest necessity existed for a mistrial. If so, double jeopardy is implicated and bars retrial.

### ANALYSIS

### *Governing Principles*

**{¶ 25}** The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution ensures that a state may not put a defendant in jeopardy twice for the same offense. *Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). It also "affords a criminal defendant a 'valued right to have his trial completed by a particular tribunal.' " *Oregon v. Kennedy*, 456 U.S. 667, 671-672, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982), quoting *Wade v. Hunter*, 336 U.S. 684, 689, 69 S.Ct. 834, 93 L.Ed. 974 (1949). However, this

> valued right to have the trial concluded by a particular tribunal is sometimes subordinate to the public interest in affording the prosecutor one full and fair opportunity to present his evidence to an impartial jury. Yet in view of the importance of the right, and the fact that it is frustrated by any mistrial, the prosecutor must shoulder the burden of justifying the mistrial if he is to avoid the double jeopardy bar. His burden is a heavy one. The prosecutor must demonstrate "manifest necessity" for any mistrial declared over the objection of the defendant.

(Footnote omitted.) *Arizona v. Washington*, 434 U.S. 497, 505, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978).

**{¶ 26}** What constitutes a "manifest necessity" is left to the discretion of the courts, which must "exercise a sound discretion on the subject [as] it is

impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes * * *." *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824).

{¶ 27} The Supreme Court cautions that the manifest-necessity standard "abjures the application of any mechanical formula by which to judge the propriety of declaring a mistrial in the varying and often unique situations arising during the course of a criminal trial." *Illinois v. Somerville*, 410 U.S. 458, 462, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973). In *Washington*, the court acknowledged that there is a wide range of possible justifications for declaring a mistrial and that the question of whether a manifest necessity exists is more easily answered in some cases than in others. "At one extreme end of the spectrum are cases in which a prosecutor requests a mistrial in order to buttress weaknesses in his evidence. * * * The prohibition against double jeopardy as it has evolved in this country was plainly intended to condemn this 'abhorrent' practice." *Id.* at 507-508, quoting *State v. Garrigues,* 2 N.C. 188, 189 (1795). At the opposite end of the spectrum, a court's decision to declare a mistrial due to a hung jury is fairly easily viewed as justified and should be afforded a high degree of deference. *Washington* at 509.

### *Application*

{¶ 28} Although trial judges are entitled to wide latitude when considering motions for mistrial, their discretion is not unbridled. As the Sixth Circuit Court of Appeals recently observed in *Ross v. Petro*, 515 F.3d 653 (6th Cir.2008), "[w]hen a mistrial is premised on the prejudicial impact of improper evidence or argument, the trial judge's evaluation of the *possibility* of juror bias is entitled to 'great deference.' " (Emphasis sic.) *Id.* at 661, quoting *Washington,* 434 U.S. at 514, 98 S.Ct. 824, 54 L.Ed.2d 717. Thus, when a mistrial is predicated on juror misconduct, the trial court finding of manifest necessity will

be upheld unless "instead of exercising sound discretion, [the trial judge] acted 'irrationally or irresponsibly.' " *Ross* at 669, quoting *Washington* at 514.

{¶ 29} But significantly, *Ross* expressly states that "[n]*otwithstanding this deference,* the reviewing court must be satisfied that the trial judge did not act irrationally or irresponsibly, but exercised 'sound discretion.' " (Emphasis added.) *Ross* at 661, quoting *Washington* at 514. Thus, *Ross* does not vitiate meaningful appellate review of mistrials. To the contrary, it supports the holding that a trial judge's determination of possible juror bias should be given great deference only upon the appellate court's satisfaction that the trial judge exercised sound discretion in determining whether juror bias existed and whether it could be cured. *Ross* does not hold, or even suggest, that the mere specter of bias is a manifest necessity that warrants mistrial.

{¶ 30} In fact, quite the opposite is true. The Supreme Court clearly teaches that hearings on the issue of a juror's impartiality "will frequently turn upon testimony of the juror in question" and that it is error to contend that such evidence "is inherently suspect." *Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982), fn. 7. " 'One may not know or altogether understand the imponderables which cause one to think what he thinks, but surely one who is trying as an honest man to live up to the sanctity of his oath is well qualified to say whether he has an unbiased mind in a certain matter.' " *Id.*, quoting *Dennis v. United States*, 339 U.S. 162, 171, 70 S.Ct. 519, 94 L.Ed. 734 (1950).

{¶ 31} Thus, understood in full context, although a trial judge's determination of juror bias is entitled to great deference, it must be predicated on the judge's proper discretion in hearing the case. Mere supposition, surmise, and possibility of prejudice are not sufficient. This distinction is a simple but critical one, and one that was overlooked by the trial judge in this case. Although a trial judge's determination of juror bias sufficient to create the need to declare a

mistrial is a matter of discretion, the record here reveals nothing of substance from which the judge made his determination.

{¶ 32} The inquiry of Juror No. 6 was limited and ineffective. The questions did not unearth what bias, if any, the juror absorbed as a result of reading the forbidden material. *See State v. Durr*, 58 Ohio St.3d 86, 91, 568 N.E.2d 674 (1991). And it certainly did not establish whether that bias, if any, could be cured by further instruction from the court. "Unless an appellant demonstrates otherwise, we should assume that the members of the jury followed their oaths and deliberated only upon the evidence adduced at trial." *Id.,* citing *State v. Zuern*, 32 Ohio St.3d 56, 60, 512 N.E.2d 585 (1987).

{¶ 33} We, of course, have no way of appraising Juror No. 6's credibility. But nothing in the record establishes that she was so "nice" that she would deny whatever bias she might have incurred in order to be "accommodating and pleasing," thereby violating her oath as a juror. The transcript reveals that she was confused about terms for which the trial judge had refused to provide instruction and took it upon herself to educate herself about the terms—in violation of an unequivocal instruction to not do so. The limited information before us also suggests that she understood that it was wrong to do so and that she had not tainted the jury with the information. Although all agree that it was error for her to conduct outside research, it was also error for the judge to make no more than a limited inquiry of the juror—an inquiry that merely established the misconduct, not any prejudice from it. The judge disregarded the constitutional commands that the court, in deciding whether a manifest necessity exists to declare a mistrial, must act "rationally, responsibly, and deliberately." We cannot conclude that the trial court acted with deliberateness in this case.

{¶ 34} The trial judge expressed openly to counsel his supposition that Juror No. 6 would "say all the right things" and "try to appease us and say what she needs to say" because she was "nice." His comments suggested that he had

simply concluded, based on some generalized sense of the juror's pleasant demeanor, that bringing her back for an attempt to explore the scope of any prejudice and to cure her misconduct "may be an exercise of futility" because "I don't know that I can be convinced that she's going to be able to put this out of her mind." No wonder that after a short recess, the judge was met with the state's motion for a mistrial. With little reflection upon hearing the motion, the judge declared that Juror No. 6 was "irreparably tainted" and granted the motion.

{¶ 35} The rapidity with which the events unfolded is not dispositive, of course. But it suggests haste in reaching a conclusion rather than a conclusion made in "the greatest caution." *Perez*, 22 U.S. (9 Wheat.) at 580, 6 L.Ed. 165.

{¶ 36} Far more troubling, though, is the fact that the record is devoid of any showing that the state shouldered its heavy burden of justifying the mistrial by showing a manifest necessity. *Washington*, 434 U.S. at 505, 98 S.Ct. 824, 54 L.Ed.2d 717. In essence, the trial judge invited the state to move for mistrial based on his apparent conclusion that there was insurmountable juror bias. And he did so without inquiry of the juror about that bias, in the face of agreement of all defense counsel that inquiry of the juror and a strong curative instruction might suffice and despite our clear precedent that when a trial court learns of possible improprieties that might affect the impartiality of a juror, the court has a duty to hold a hearing to determine whether any bias has been introduced into the jury room. *See State v. Phillips*, 74 Ohio St.3d 72, 88-89, 656 N.E.2d 643 (1995) (court has duty to hold hearing on possible juror bias resulting from improper outside communication).

{¶ 37} Had the judge actually inquired into the salient issue of prejudice with the juror, he may well have acted within his discretion. But we cannot condone the notion that a judge acts rationally, reasonably, or deliberately in declaring a mistrial, on retrial, in a difficult criminal case without any meaningful

inquiry into the issue of juror bias. It is neither lawful nor conscionable to predicate a mistrial on speculation alone.

{¶ 38} A mistrial declared upon the judge's mere speculation of prejudice is not an act of "the greatest caution." *Perez*, 22 U.S. (9 Wheat.) at 580, 6 L.Ed. 165. It is a travesty. And that is exactly what is before us.

{¶ 39} The court of appeals was correct in holding that the mistrial was in error and that the Constitution demands reversal of these convictions.

## CONCLUSION

{¶ 40} The decision to declare a mistrial based on juror misconduct is a matter within the sound discretion of the trial court and is entitled to great, but not unlimited, deference by a reviewing court. In this case, the trial court did not soundly exercise that discretion by inquiring of the juror to ascertain the scope of the prejudice, if any, to the appellee before determining that the juror could not be rehabilitated and that a mistrial was necessary. Because the record here cannot establish that a manifest necessity existed to declare a mistrial, double jeopardy attaches, and the Constitution commands that no further prosecution of the appellee may occur. Accordingly, the judgment of the court of appeals is affirmed to the extent that it held that the Double Jeopardy Clause barred retrial.

Judgment affirmed.

PFEIFER, LANZINGER, and MCGEE BROWN, JJ., concur.

LUNDBERG STRATTON, O'DONNELL, and CUPP, JJ., dissent.

_____

**LANZINGER, J., concurring.**

{¶ 41} I concur in the majority opinion, but write separately to address issues concerning the appealability of the denial of a motion to dismiss on double jeopardy grounds, the duty of a trial judge in considering a motion for mistrial like the one in this case, and the technological aspects present here.

*Initial Matters*

**{¶ 42}** At the outset, I share the concurring appellate judge's concern over precedent holding that the denial of a motion to dismiss on double jeopardy grounds is not a final, appealable order. *State v. Crago*, 53 Ohio St.3d 243, 559 N.E.2d 1353 (1990), syllabus. Gunnell's first trial was in 2005, and she has been unable to appeal the denial of her motion to dismiss on double jeopardy grounds after the second trial, having to wait until the completion of a third trial. In *Crago*, this court overruled the unanimous opinion in *State v. Thomas*, 61 Ohio St.2d 254, 400 N.E.2d 897 (1980), in which we held that the overruling of a motion to dismiss on the ground of double jeopardy is a final, appealable order under R.C. 2953.02 and 2505.02. *Id.* at paragraph one of the syllabus. We stated in *Thomas*:

It is clear that the Double Jeopardy Clause is a guarantee against being twice put to trial for the same offense. *Abney v. United States* (1977), 431 U.S. 651, 661, 97 S.Ct. 2034, 52 L.Ed.2d 651. It is equally clear that an order affecting a right of constitutional dimensions is an "order affecting a substantial right," within the contemplation of R.C. 2505.02. It would seem reasonable to conclude that some form of review prior to judgment is necessary to preserve this right. Id. at page 660.

\* \* \*

We believe that a proceeding on a motion to dismiss for double jeopardy should be considered a special proceeding as well. A claim of double jeopardy raises an issue entirely collateral to the guilt or innocence of the defendant. While it is a complete defense, it is more than that, for it, in principle, bars a new trial as well as a new conviction. Additionally, an erroneous decision on a

double jeopardy claim cannot be effectively reviewed after judgment within the second trial; by that time, the defendant's right has been violated.

We hold, therefore, that the overruling of a motion to dismiss on the ground of double jeopardy is a final appealable order under R.C. 2953.02 and 2505.02. *Owens v. Campbell* [(1971)], 27 Ohio St.2d 264, 272 N.E.2d 116, is hereby overruled.

*Thomas*, 61 Ohio St.2d at 258.

### *A Shifted Burden*

**{¶ 43}** When a defendant objects to a mistrial, as Gunnell did in this case, the government must bear the burden of demonstrating manifest necessity for the mistrial. *Arizona v. Washington*, 434 U.S. 497, 505, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978) ("in view of the importance of the right [of a defendant to have the trial concluded by a particular tribunal], and the fact that it is frustrated by any mistrial, the prosecutor must shoulder the burden of justifying the mistrial if [the prosecutor] is to avoid the double jeopardy bar").

**{¶ 44}** The decision to declare a mistrial is one of last resort, and courts should be careful to exhaust all other alternatives before taking this extraordinary step. Other things may be done to obviate misconduct, such as giving supplemental jury instructions or reducing the size of the jury panel by agreement of the parties. Furthermore, while it did not do so at the time, Crim.R. 24(G)(1) now permits the substitution of alternate jurors in noncapital criminal cases. (*See* former Crim.R. 24(G)(1), 109 Ohio St.3d CXXII, effective July 1, 2006, requiring that an alternate juror who has not replaced a regular juror be discharged when the jury retires to consider its verdict.)

**{¶ 45}** There is no evidence in the record that the jurors were given specific warning that the Internet was off limits during the progress of the trial.

While the record in this appeal does not include a transcript of the jury instructions from the second trial, the court's entry declaring a mistrial quotes portions of the instructions, which are merely general, directing the jury to rely only on testimony and evidence presented in court and to refrain from discussing the case. Before the voir dire in this case, the court stated:

> It's also critical that if you are selected as a juror in this case and you get to the point where you're deliberating, that during your deliberations * * * you only consider the evidence that's presented to you in the courtroom during the course of this trial. And that's absolutely critical in order for there to be a fair trial to both sides. It wouldn't be fair to either side if jurors were in the jury room deliberating and talking about issues or facts that were not addressed during the course of the trial. For one, they may not be factual. They may not be facts. And two, the attorneys may or may not be aware of those things, and, therefore, wouldn't be able to incorporate those things into their arguments. *So it is critical that you, from this point on, limit the information that you take in with respect to this case to that which is presented to you in the courtroom.* And I think that you all have a pretty good understanding and idea of the importance of—of that concept.

(Ellipsis and emphasis sic.)

{¶ 46} After the jury had been seated and opening statements had been given, the court told the jury, "It's absolutely critical that from this point on, the only exposure you have to this case is from what transpires here in the courtroom." As part of the jury instructions, the court stated:

18

It is now the duty of the Court to instruct you on the law which applies to this case. The Court and the jury have separate functions. You decide the disputed facts and the Court gives the instructions of law. It is your sworn duty to accept these instructions and to apply the law as it is given to you. You may neither change the law nor apply your own idea of what you think the law should be.

\* \* \*

It is your duty to weigh the evidence, decide the disputed questions of fact, *apply the instructions of law to your findings*, and render your verdict accordingly.

(Emphasis sic.)

{¶ 47} Based on the trial court's entry, it appears that while the court's instructions clearly stated that jurors were to consider only evidence presented at trial, the instructions were more vague regarding whether jurors were forbidden to consult outside sources such as the Internet or new technology to assist them in applying the court's instructions of law to their findings of fact. Several legal commentators have noted that juror research of this type is a great concern in this age of new media.[3] As the juror herself noted, "everybody kept asking what the word 'perverse' was, and I just wanted to look it up for myself to see exactly what it meant."

{¶ 48} The prevalent and expanding nature of new media presents trial courts with the challenge of instructing jurors regarding technology that has become an everyday part of their lives. In this case, it was only after the court

---

3. *See, e.g.,* Hoffmeister, *Google, Gadgets, and Guilt: Juror Misconduct in the Digital Age*, 83 U.Colo.L.Rev. 409, 419-425 (2012); Artigliere, Barton & Hahn, *Reining in Juror Misconduct: Practical Suggestions for Judges and Lawyers*, 84 Fla.Bar J. 8-10 (Jan.2010).

had decided to declare a mistrial that the trial court informed the jurors that they were to rely only on the jury instructions and their personal knowledge to define words:

> When there's no specific definition for a word or a term, I'm not allowed to give you my idea of what I think it is.
>
> If it's not spelled out as a legal definition in the Ohio Jury Instructions, then you're simply to come up with an understanding of that term. The collective body is to come up with a collective understanding of what that term means.

{¶ 49} Based upon the information given to the jury, the trial court's reasoning that the juror had willfully violated the court's order and would continue to violate it was speculative at best.

*Abuse-of-Discretion Standard*

{¶ 50} According to the record, the jury had asked the court for the definition of "perverse" during deliberations, but was not given a response. The next morning, the juror who allegedly committed misconduct brought two items with her to the courthouse. One was a written definition of the term "perverse" that she intended to share with the jurors. The other was a printout containing a hypothetical example of involuntary manslaughter, which the juror admitted she had printed off the Internet. She told the judge that she had not discussed these items with anyone. When the judge asked her why she felt that she needed these materials, she responded, "I was at home. I was on the computer, and I just—I did not get much sleep last night, and I just—that was mainly for myself. I just wanted to have it clear in my own head."

{¶ 51} The parties declined to question the juror and initially told the judge that a curative instruction would be sufficient.

{¶ 52} It is an abuse of discretion to make findings that are unsupported by the record. At the very least, the court should have inquired about the juror's ability to put aside the improper information and should have questioned the other jurors to see if they were affected by the improper information. As the situation in the third trial showed, more can and should be done. In the third trial during deliberations, the jurors had examined an exhibit that should not have been given to them. Defense counsel moved for a mistrial. The court examined the jurors individually to determine whether they were capable of continuing fair and unbiased deliberations despite the fact that they had all seen the inadvertently included exhibit. When the questioning was completed, and every juror stated that he or she could disregard the exhibit and resume impartial deliberations, the court allowed deliberations to continue on the basis that this situation was "significantly different" from the situation involving the juror in the second trial. The court noted that "the difference here is that I have the utmost confidence in this jury and their ability to follow instructions." The court determined this based upon having questioned the jurors and evaluated "their appearance, their demeanor, the manner in which they were responding to my questions[,] [t]he reasonableness of their responses, their attentiveness, their frankness, * * * their intelligence, their comprehension of the situation, together with all the facts and circumstances surrounding the case." It is of concern that the trial court would go to such great lengths to determine whether deliberations should continue in the third trial, but failed to even question the juror in the second trial regarding her ability to continue deliberations.

{¶ 53} We have noted that "[i]n cases involving outside influences on jurors, trial courts are granted broad discretion in dealing with the contact and determining whether to declare a mistrial or to replace an affected juror." *State v. Phillips*, 74 Ohio St.3d 72, 89, 656 N.E.2d 643 (1995). However, we have also held that "[w]hen a trial court learns of an improper outside communication with

a juror, it must hold a hearing to determine whether the communication biased the juror." *Id.* at 88. Similarly, when a trial court learns that a juror has improperly reviewed outside information, the court has a duty to hold a hearing to determine whether the juror has become biased. The trial court abused its discretion in declaring a mistrial in the second trial without conducting a hearing with the juror on the question of bias and further examining the other jurors.

{¶ 54} Mindful that "manifest necessity" is a standard that cannot be applied mechanically or without attention to the particular problem confronting the trial judge, *Arizona v. Washington*, 434 U.S. at 506, 98 S.Ct. 824, 54 L.Ed.2d 717, I concur that the state did not meet the heavy burden of demonstrating manifest necessity for a mistrial in the second trial.

_____

**MCGEE BROWN, J., concurring.**

{¶ 55} I concur with Justice Lanzinger on the need to review our decision in *State v. Crago*, 53 Ohio St.3d 243, 559 N.E.2d 1353 (1990), on whether the overruling of a motion to dismiss on double jeopardy grounds is a final, appealable order.

_____

**O'DONNELL, J., dissenting.**

{¶ 56} Respectfully, I dissent.

{¶ 57} This murder case has been litigated on three separate occasions. The first resulted in a reversal due to a *Batson* issue. The second resulted in a mistrial, based on juror misconduct. This appeal is from the third trial, which resulted in guilty verdicts, but which the Second District Court of Appeals reversed on double jeopardy grounds. The matter at issue before our court is whether the trial court properly granted a mistrial based on juror misconduct during jury deliberations in the second trial. In my view, the trial court properly declared a mistrial due to the misconduct of Juror No. 6, who conducted

22

independent Internet research contrary to and in disregard of the court's instructions. In my view, double jeopardy principles do not preclude retrial in this case. The trial court here, in the exercise of its discretion, found that a manifest necessity existed to declare a mistrial. Moreover, in a separate proceeding, the United States district court denied writs of habeas corpus seeking to bar retrial on double jeopardy grounds, finding that the mistrial declaration "was not an unreasonable application" of United States Supreme Court law, and that determination was affirmed by the Sixth Circuit Court of Appeals.

{¶ 58} This court ought not substitute its judgment for that of the trial court, as upheld by the federal district court and the federal circuit court of appeals. In my view, the intermediate state appellate court misapplied the manifest necessity standard and substituted its judgment for that of the trial court, and I would reverse its judgment and remand the matter for retrial.

### Facts and Procedural History

{¶ 59} The material facts of this senseless homicide case are not disputed. Toneisha Gunnell, Mahogany Patterson, Alicia McAlmont, and Renada Manns conspired to steal clothes from stores at the Upper Valley Mall in Springfield, Ohio. After stealing armloads of clothes from Macy's Department Store, Patterson, Gunnell, and McAlmont ran toward a waiting getaway car operated by Manns. A store security guard pursued them, but as they got into the car, Manns sped off to avoid apprehension.

{¶ 60} As the getaway car was speeding away, John Deselem, a mall patron, was walking across the parking lot and apparently had seen the security guard chase the fleeing vehicle. He stopped, faced the oncoming vehicle, and waved his arms in an apparent effort to stop it. Without slowing, the vehicle struck Deselem. The force of the impact propelled Deselem into the windshield, over the vehicle, and onto the asphalt, where Deselem died from blunt injuries to his head. After hitting Deselem, the vehicle sped off. A short time later police

discovered it abandoned not far from the mall. Gunnell, Patterson, McAlmont, and Manns surrendered to Columbus police the following day.

{¶ 61} A Clark County grand jury indicted Gunnell, Patterson, McAlmont, and Manns on counts of murder, aggravated robbery, involuntary manslaughter, and theft. A joint trial was held in which a jury found them all guilty of all charges. Each separately appealed. The appellate court reversed their convictions based on a *Batson* violation. *State v. Manns,* 169 Ohio App.3d 687, 2006-Ohio-5802, 864 N.E.2d 657 (2d Dist.); *State v. McAlmont,* 2d Dist. No. 2005 CA 130, 2006-Ohio-6838; *State v. Patterson,* 2d Dist. No. 05CA0128, 2007-Ohio-29; *State v. Gunnell*, 2d Dist. No. 2005 CA 119, 2007-Ohio-2353. *See generally Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

{¶ 62} Gunnell, Manns, McAlmont, and Patterson were tried a second time before a jury. Before the second trial began, the trial court addressed prospective jurors:

> It's also critical that if you are selected as a juror in this case and you get to the point where you're deliberating, that during your deliberations * * * you only consider the evidence that's presented to you in the courtroom during the course of this trial. And that's absolutely critical in order for there to be a fair trial to both sides. It wouldn't be fair to either side if jurors were in the jury room deliberating and talking about issues or facts that were not addressed during the course of the trial. For one, they may not be factual. They may not be facts. And two, the attorneys may or may not be aware of those things, and, therefore, wouldn't be able to incorporate those things into their arguments. *So it is critical that you, from this point on, limit the information that you take in with respect to this case to that which is presented to you in the*

24

*courtroom.* And I think that you all have a pretty good understanding and idea of the importance of—of that concept.

(Emphasis added.)

{¶ 63} After empaneling the jury, the trial court further instructed: "It's absolutely critical that from this point on, the only exposure you have to this case is from what transpires here in the courtroom."

{¶ 64} And again before submitting the case to the jurors for deliberation, the court charged:

It is now the duty of the Court to instruct you on the law which applies to this case. The Court and the jury have separate functions. You decide the disputed facts and the Court gives the instructions of law. It is your sworn duty to accept these instructions and to apply the law as it is given to you. You may neither change the law nor apply your own idea of what you think the law should be.

    \* \* \*

It is your duty to weigh the evidence, decide the disputed questions of fact, apply the instructions of law to your findings, and render your verdict accordingly.

{¶ 65} During late-night deliberations, the jury asked the court to define the word "perverse" as it had been used in the jury instruction relating to the recklessness element of the aggravated-robbery charge. The court did not respond to the inquiry, but permitted the jury to retire for the evening. The next day, as the jury was returning to the deliberating room, the bailiff noticed that Juror No. 6 carried two pieces of paper, which the bailiff retrieved and delivered to the court.

**{¶ 66}** The first contained the following definition of the word "perverse": "contrary to the manner or direction of the judge on a point of law <perverse verdict>."

**{¶ 67}** The second stated:

> Manslaughter: Involuntary
>
> Involuntary manslaughter usually refers to an unintentional killing that results from recklessness or criminal negligence, or from an unlawful act that is a misdemeanor or low-level felony (such as *DUI*). The usual distinction from voluntary manslaughter is that involuntary manslaughter (sometimes called "criminally negligent homicide") is a crime in which the victim's death is unintended.
>
> For example, Dan comes home to find his wife in bed with Victor. Distraught, Dan heads to a local bar to drown his sorrows. After having five drinks, Dan jumps into his car and drives down the street at twice the posted speed limit, accidentally hitting and killing a pedestrian.

(Underlining sic.)

**{¶ 68}** As a result, the trial court conducted a voir dire examination of Juror No. 6:

> THE COURT: It's come to our attention that you brought some items in with you this morning. One appears to be a handwritten definition of the term "perverse," and another one appears to be something that maybe you printed off of the internet that—

JUROR NO. 6: Yes, I did.

THE COURT: A definition or instruction on "involuntary manslaughter." * * *

JUROR NO. 6: That nobody saw them.

THE COURT: You're the only one that saw them?

JUROR NO. 6: I told [the bailiff] that I didn't know we weren't allowed. I'm sorry.

THE COURT: Okay. Did you—

JUROR NO. 6: And I didn't talk about it.

THE COURT: All right. Apparently you were doing some research last night or this morning on the internet or—

JUROR NO. 6: I just wanted to see—everybody kept asking what the word "perverse" was, and I just wanted to look it up for myself to see exactly what it meant.

THE COURT: Sure. Okay. What about the—what about the manslaughter issue? Was there something you were doing on the computer with respect to that?

JUROR NO. 6: No. It was just something I wanted—that was for me. I wasn't going to show them that. I had the other—I had the definition. That was all that I was going to share.

THE COURT: Was there—was there something inadequate or something wrong with the Court's instruction for "involuntary manslaughter" that you felt like you needed to supplement the instruction or what—was there something that wasn't clear about the Court's instruction on that?

JUROR NO. 6: No. I was—I was at home. I was on the computer, and I just—I did not get much sleep last night, and I

just—that was mainly for myself. I just wanted to have it clear in my own head.

THE COURT: Okay. Okay. Counsel have any questions for this particular juror?

MR. SCHUMAKER: None from the State, Your Honor.

MR. REED: No, Your Honor. Thank you.

MR. KAVANAGH: No, Your Honor.

MS. CUSHMAN: No.

MR. GRIFFIN: No, Your Honor.

{¶ 69} After the court excused the juror, the court heard from the parties and questioned whether a curative instruction would alleviate the prejudice to the prosecution's case, because the involuntary-manslaughter hypothetical example misstated Ohio law. The prosecution moved for a mistrial. The defense objected and urged that Juror No. 6 could be rehabilitated, but it did not ask to reopen the voir dire of the juror.

{¶ 70} The court concluded that the juror had been irreparably tainted and found that the hypothetical example she brought to court did not comport with Ohio law. The court also concluded that a curative instruction would not remedy the problem, because it could not be assured that Juror No. 6, having already violated its instructions to disregard outside information, would obey a curative instruction and would not taint other members of the panel. Counsel did not dispute that the definition did not correctly state Ohio law and that substituting an alternate juror was not possible and not permitted by Crim.R. 24. For these reasons, the court declared a mistrial and discharged the jury.

{¶ 71} Gunnell, Patterson, McAlmont, and Manns then moved to preclude retrial on double jeopardy grounds, asserting that there had been no manifest

necessity for a mistrial. The trial court denied that motion and scheduled the case for retrial.

{¶ 72} They then petitioned the United States district court for writs of habeas corpus seeking to bar retrial on double jeopardy grounds. The district court dismissed the petitions, concluding that the trial court's declaration of a mistrial "was not an unreasonable application of clearly established law as declared by the United States Supreme Court." *Gunnell v. Rastatter*, S.D.Ohio No. 3:08-CV-064, at 13 (Sept. 17, 2008). Manns appealed to the Sixth Circuit Court of Appeals, which affirmed the dismissal. *Gunnell v. Rastatter*, 6th Cir. No. 08-4505 (Jan. 26, 2010). Manns subsequently resolved her case by way of a plea agreement with the state.

{¶ 73} The trial court then retried Gunnell, McAlmont, and Patterson, and the jury returned verdicts finding them all guilty of all charges. They separately appealed, and the Second District Court of Appeals reversed the convictions. In Patterson's and Gunnell's cases, the court held that the trial court should have declared a mistrial because a statement of a state's witness from a previous trial, which had not been admitted into evidence, had inadvertently been submitted to the jury. *State v. Patterson*, 188 Ohio App.3d 292, 2010-Ohio-2012, 935 N.E.2d 439 (2d Dist.); *State v. Gunnell,* 2d Dist. No. 09-CA-0013, 2010-Ohio-4415, ¶ 51. And in Gunnell's and McAlmont's cases, the court held that double jeopardy barred retrial because no manifest necessity existed for the mistrial declared at the second trial. *Gunnell* at ¶ 194; *State v. McAlmont*, 2d Dist. No. 09-CA-21, 2010-Ohio-5879, ¶ 2-3. The state appealed the appellate court reversals to this court. Thereafter, Patterson negotiated a plea agreement, and the state dismissed that appeal.

{¶ 74} We accepted the state's appeal in this case to review whether the trial court acted reasonably in dealing with juror misconduct and in finding that a

manifest necessity existed for a mistrial, so that the protection against double jeopardy does not bar retrial.

**Law and Analysis**

{¶ 75} The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution safeguards the accused from repeated prosecutions for the same offense and "affords a criminal defendant a 'valued right to have his trial completed by a particular tribunal.' " *Oregon v. Kennedy*, 456 U.S. 667, 671-672, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982), quoting *Wade v. Hunter*, 336 U.S. 684, 689, 69 S.Ct. 834, 93 L.Ed. 974 (1949). This "valued right to have the trial concluded by a particular tribunal is sometimes subordinate to the public interest in affording the prosecutor one full and fair opportunity to present his evidence to an impartial jury." *Arizona v. Washington*, 434 U.S. 497, 505, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978). Double jeopardy principles thus do not automatically bar retrial when the trial court terminates a criminal trial without finally resolving the merits of the charges against the accused.

{¶ 76} Whether a mistrial should be declared "abjures the application of any mechanical formula by which to judge the propriety of declaring a mistrial in the varying and often unique situations arising during the course of a criminal trial." *Illinois v. Somerville*, 410 U.S. 458, 462, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973). A declaration of a mistrial turns on the particular facts of a case and therefore escapes meaningful categorization. *Id.* at 464. In *Somerville*, the United States Supreme Court distilled a general approach for the review of a declaration of a mistrial premised on the "public justice" policy set forth in *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824). *See id.* at 580 ("in all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the

ends of public justice would otherwise be defeated"). The *Somerville* court instructed:

> A trial judge properly exercises his discretion to declare a mistrial if an impartial verdict cannot be reached, *or if a verdict of conviction could be reached but would have to be reversed on appeal due to an obvious procedural error in the trial*. If an error would make reversal on appeal a certainty, it would not serve "the ends of public justice" to require that the Government proceed with its proof when, if it succeeded before the jury, it would automatically be stripped of that success by an appellate court.

(Emphasis added.) *Id.* at 464.

{¶ 77} Juror misconduct, such as a juror's violation of a court's charge by bringing information into the deliberating room that is not evidence, is an obvious procedural error that may subject a verdict of conviction to reversal on appeal. *See State v. Sheppard*, 84 Ohio St.3d 230, 233, 703 N.E.2d 286 (1998) ("The juror's decision to ask his psychologist friend for an outside opinion constitutes juror misconduct"); *In re Hamilton*, 20 Cal.4th 273, 294, 84 Cal.Rptr.2d 403, 975 P.2d 600 (1999) ("When the overt event is a direct violation of the oaths, duties, and admonitions imposed on actual or prospective jurors, such as when a juror conceals bias on voir dire, consciously receives outside information, discusses the case with nonjurors, or shares improper information with other jurors, the event is called juror misconduct"). Here, Juror No. 6's actions constituted juror misconduct: she performed independent research at home on a computer in violation of instructions to avoid and ignore extraneous information about the case, and she admitted that she intended to rely on it in deliberations and to share at least some of it with other members of the jury.

**{¶ 78}** In response to this misconduct, the trial court examined the juror, consulted with the parties, considered the impact of the juror's misconduct on the fairness of the trial, and articulated its reasons for declaring a mistrial. Recognizing that the juror had already intentionally disregarded instructions on avoiding outside information, the trial court could reasonably conclude that a curative instruction would not guarantee the fairness of the proceeding, that it would be followed, or that it would prevent other members of the panel from being tainted. Further, defense counsel did not assert that the juror-obtained definition of manslaughter comported with Ohio law. In addition, the court at least considered the possibility of replacing Juror No. 6 with an alternate juror, but all parties agreed that Crim.R. 24 precluded that measure.

**{¶ 79}** In *Washington*, the United States Supreme Court directed that "the overriding interest in the evenhanded administration of justice requires that we accord the highest degree of respect to the trial judge's evaluation of the likelihood that the impartiality of one or more jurors may have been affected * * *." *Id.,* 434 U.S. at 511, 98 S.Ct. 824, 54 L.Ed.2d 717.

**{¶ 80}** A review of the record demonstrates that the trial court reasonably found that a manifest necessity existed to declare a mistrial in these circumstances. *Accord Ross v. Petro*, 515 F.3d 653, 661 (6th Cir.2008), quoting *Washington* at 514 ("When a mistrial is premised on the prejudicial impact of improper evidence or argument, the trial judge's evaluation of the *possibility* of juror bias is entitled to 'great deference.' " (Emphasis sic.))

**{¶ 81}** Accordingly, because (1) double jeopardy does not bar retrial where a manifest necessity exists to declare a mistrial, (2) under the circumstances of this case a manifest necessity existed for the declaration of a mistrial, and (3) the trial court did not abuse its discretion by declaring a mistrial, I would reverse the judgment of the court of appeals and remand the cause to the common pleas court for retrial.

LUNDBERG STRATTON and CUPP, JJ., concur in the foregoing dissenting opinion.

_____

D. Andrew Wilson, Clark County Prosecuting Attorney, and Andrew R. Picek, Assistant Prosecuting Attorney, for appellant.

James N. Griffin, for appellee.

Murr, Compton, Claypoole & Macbeth and Charles M. Blue, urging affirmance for amicus curiae Alicia McAlmont.

Dennis P. Will, Lorain County Prosecuting Attorney, and Billie Jo Belcher, Assistant Prosecuting Attorney, urging reversal for amicus curiae Ohio Prosecuting Attorneys Association.

_____